# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: § | § | |
| § | § | CASE NO: 19-12440 |
| ANDREW AND CHRISTINE BLANCHARD, § | § | |
| § | § | CHAPTER 11 |
| § | § | |
| DEBTORS. § | § | SECTION A |
| § | | |

| | | |
|---|---|---|
| ANDREW AND CHRISTINE BLANCHARD, § | § | |
| § | § | |
| § | § | |
| PLAINTIFFS, § | § | |
| § | § | ADVERSARY NO. 20-1054 |
| V. § | § | |
| § | § | |
| GULF COAST PREMIUM SEAFOODS, LLC AND GREGORY JONES, § | § | |
| § | § | |
| DEFENDANTS. § | § | |

## MEMORANDUM OPINION AND ORDER

This Court conducted a one-day trial on August 26, 2021, (the "Trial"), to resolve the breach-of-contract and fraud claims asserted in the *Adversary Complaint* filed by Andrew and Christine Blanchard (the "Complaint"), [ECF Doc. 1], and the *Answer to Adversary Complaint* filed by Gregory Jones, [ECF Doc. 12], filed in the above-captioned adversary. At the Trial, the Court heard testimony from Plaintiffs Andrew and Christine Blanchard and Defendant Gregory Jones on his own behalf.[1] The Court admitted into evidence the following exhibits: Blanchard Exhibits 1–80.

---

[1] Jones did not submit a witness or exhibit list in compliance with the *Order Setting Virtual Trial* dated February 25, 2021, [ECF Doc. 17], but due to his pro se status, the Court accepted his opening statement as his testimony. The Court acknowledges that "pro se pleadings are held to less stringent standards than pleadings drafted by lawyers," and "pro se pleadings must be treated liberally." *U.S. v.*

At the close of the Trial, the Court took the matter under submission. The Court now makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable to these proceedings by Rule 7052 of the Federal Rules of Bankruptcy Procedure.[2]

## JURISDICTION AND VENUE

Federal district courts enjoy "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). But "[e]ach district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 . . . be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a).

Those "cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11" are proceedings that a bankruptcy judge may hear and decide on a final basis, subject to appellate review by the district court. 28 U.S.C. § 157(b); *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 671 (2015). Section 157 provides a nonexclusive list of matters considered to be "[c]ore proceedings." 28 U.S.C. § 157(b)(2); *see also Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir. 1987) ("[T]he phrases 'arising under' and 'arising in' are helpful indicators of the

---

*Robinson*, 78 F.3d 172, 174 (5th Cir. 1996); *Priester v. Lowndes Cnty.*, 354 F.3d 414, 418 (5th Cir. 2004). Nevertheless, "a pro se litigant is not 'exempt . . . from compliance with the relevant rules of procedural and substantive law.'" *NCO Fin. Sys., Inc. v. Harper–Horsley*, No. 07–4247, 2008 WL 2277843, at *3 (E.D. La. May 29, 2008) (citations omitted); *see also Franklin v. Comm'r*, 297 F. App'x 307, 310 (5th Cir. 2008). "A pro se litigant is not entitled to greater rights than would be a litigant represented by a lawyer." *NCO Fin. Sys., Inc.*, 2008 WL 2277843, at *3; *see also Eustice v. La. Through Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, No. CV 18-1008-SDD-RLB, 2020 WL 3520298, at *7 (M.D. La. June 29, 2020), *report and recommendation adopted*, No. CV 18-1008-SDD-RLB, 2020 WL 3966320 (M.D. La. July 13, 2020).

2     These findings of fact and conclusions of law constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052. To the extent that any of the following findings of fact are determined to be conclusions of law, they are adopted and shall be construed and deemed conclusions of law. To the extent any of the following conclusions of law are determined to be findings of fact, they are adopted and shall be construed and deemed as findings of fact.

2

meaning of core proceedings. If the proceeding involves a right created by the federal bankruptcy law, it is a core proceeding; for example, an action by the trustee to avoid a preference. If the proceeding is one that would arise only in bankruptcy, it is also a core proceeding; for example, the filing of a proof of claim or an objection to the discharge of a particular debt.").

But a matter is considered to be "non-core" if it is merely "related to" a case under title 11. *See* 28 U.S.C. § 157(c)(1). "[B]ankruptcy courts [possess] more limited authority in non-core proceedings: They may 'hear and determine' such proceedings, and 'enter appropriate orders and judgments,' only 'with the consent of all parties to the proceeding.'" *Wellness Int'l Network, Ltd.*, 575 U.S. at 671 (quoting 28 U.S.C. § 157(c)(2)). "Absent consent, bankruptcy courts in non-core proceedings may only 'submit proposed findings of fact and conclusions of law,' which the district courts review *de novo*." *Id.* (quoting 28 U.S.C. § 157(c)(1)).

Here, the parties consented to the Court entering a final judgment on non-core claims. [ECF Doc. 17]. Therefore, this Court has jurisdiction to grant the relief provided for herein on a final basis pursuant to 28 U.S.C. §§ 1334 and 157(c)(2). The venue of the Debtors' chapter 11 case is proper under 28 U.S.C. §§ 1408 and 1409(a).

## FINDINGS OF FACT

This dispute centers on a short-lived business relationship between the Blanchards and Jones. The Blanchards filed this adversary proceeding against Jones and his corporation, Gulf Coast Premium Seafoods, LLC,³ to recover damages for fraud and breach of an April 2018 agreement whereby the Blanchards quitclaimed their business', Pearl, Inc., assets in exchange for Jones's promise to pay the obligations of the business and salaries to each of the Blanchards for

---

³ At trial, no evidence was presented as to the liability of Gulf Coast Premium Seafoods. For that reason, the Court does not award the Blanchards any relief against Gulf Coast Premium Seafoods and regards any claims asserted against that defendant as waived.

3

continuing to oversee day-to-day operations. *See* Hr'g at Min. 9:50–:53; 10:58–:59. Jones contends that no binding agreement between the parties exists because "no contract was signed." *See* Hr'g at Min. 9:21–:23.

Upon listening to the testimony and observing the countenance of each witness, the Court finds Andrew and Christine Blanchard to be earnest witnesses and affords considerable weight to the testimony of each of them. The Court particularly found Christine Blanchard's testimony to be most reliable because of her extensive involvement in the daily operations and finances of Pearl, Inc. and because she personally exchanged the majority of e-mails with Jones. *See* Blanchard Exs. 2–18, 20–21 & 23–80. Based on the testimony and documentary evidence before the Court, and for the reasons discussed below, the Court enters judgment in favor of the Blanchards.

    A.    **Pearl, Inc**.

The Blanchards are both residents of Terrebonne Parish, Louisiana, and are married. *See* Hr'g at Min. 9:41, 11:05. Andrew Blanchard has worked in shrimp-processing his whole life and has operated his own processing plant since 1995. *See* Hr'g at Min. 9:40. The Blanchards incorporated Pearl, Inc. in 2000 to process seafood in three processing plants near Houma, Louisiana. *See* Hr'g at Min. 9:41; 10:01; 11:05.

    B.    **Gregory Jones and the Sale of Pearl, Inc.**

Domestic shrimp-processing was very lucrative in the 1990s, but the industry took a downturn in late 2000 and, according to Andrew Blanchard, never fully recovered because of the United States' preference for international imports. *See* Hr'g at Min. 9:44. As of 2018, Pearl, Inc. had accrued approximately $1.5 million in debt and a judgment lien had been recorded against one of its processing plants. *See* Blanchard Ex. 1; Hr'g at Min. 9:44–:49. As a result, Andrew

Blanchard hired a realtor who marketed Pearl, Inc.'s assets for an asking price of approximately $3 million. *See* Hr'g at Min. 9:49.

Andrew Blanchard met Jones through a fellow member on the Louisiana Shrimp Task Force and trusted figure in the shrimp-processing community. *See* Hr'g at Min. 9:47–:48. In March 2018, Jones approached the Blanchards with an offer to buy Pearl, Inc., which included the three processing plants and the immovable property upon which the plants were located. *See* Hr'g at Min. 9:47–:52. When meeting with the Blanchards, Jones painted himself as "successful in business," owning twelve to fourteen radio stations, car dealerships, and hotels in Florida. *See* Hr'g at Min. 9:54–:56; 12:22–:23. He also told the Blanchards he owned a helicopter and a vessel in Louisiana, which he intended to use to operate the shrimp-processing business. *See* Hr'g at Min. 9:54–:56. But Jones told the Blanchards that Pearl, Inc.'s asking price of $3 million was too steep and suggested an alternative deal: that the Blanchards quitclaim all of Pearl, Inc.'s assets to him in exchange for his promise to pay off Pearl, Inc.'s debt, which at that time totaled $1,746,640. *See* Blanchard Ex. 19; Hr'g at Min. 9:49–:55. Leading up to the closing of the deal, Jones told the Blanchards that he had sufficient financing to pay off the debts in two weeks, and the Blanchards fully disclosed Pearl, Inc.'s financial status, including all of the business's assets and liabilities, as well as past years' profit and loss statements. *See* Blanchard Exs. 2, 3, 5–9, 13–16 & 23; Hr'g at Min. 9:26–:29; 9:49–:59; 11:06–:13; 11:25–:31.

  C.  **The Memorandum of Understanding**

On April 13, 2018, Jones e-mailed a signed Memorandum of Understanding ("MOU") which he himself had drafted. *See* Blanchard Exs. 17 & 19; Hr'g at Min. 9:50–:58; 10:53; 10:58; 11:21–:25; 12:24. Christine Blanchard printed the copy of the MOU executed by Jones and Jones traveled from Florida to Chauvin, Louisiana to witness Andrew Blanchard sign the MOU on April

16, 2018. *See* Blanchard Exs. 17 & 19; Hr'g at Min. 9:50–:58; 10:53; 10:58; 11:21–:25; 12:24.[4] The MOU outlines the terms of the sale of Pearl, Inc.: (i) the Blanchards would each receive a $50,000 yearly salary for managing the daily operations of the business; (ii) the Blanchards would assign Pearl, Inc.'s existing contracts to Jones; and (iii) upon the Blanchards quitclaiming Pearl, Inc.'s assets to Jones, Jones would pay off $1,746,640 of Pearl, Inc.'s debts. *See* Blanchard Ex. 19.[5] On April 17, 2018, pursuant to the MOU, the Blanchards signed a quitclaim deed—also drafted by Jones—in front of a notary and sent it to Jones via FedEx, thereby quitclaiming all of Pearl, Inc.'s assets to Jones. *See* Hr'g at Min. 9:58; 10:58; 11:21–:25; 12:24; Blanchard Exs. 20–22. Jones recorded the quitclaim deed in Houma, Louisiana on April 19, 2018. *See* Blanchard Ex. 22.

The Blanchards acknowledge that they did not have an attorney review the MOU or the quitclaim deed. *See* Hr'g at Min. 10:00. In an e-mail to Jones regarding the executed quitclaim deed, Christine Blanchard exclaimed that the parties' execution of the MOU and quitclaim deed meant "new beginnings" for Pearl, Inc. *See* Hr'g at Min. 11:21–:25; Blanchard Ex. 20. Jones never indicated—and the plain text of the MOU does not state—that the execution or effectiveness of the MOU was contingent on (i) Jones obtaining financing, (ii) the drafting and execution of a second purchase agreement, or (iii) Pearl, Inc. satisfying any due diligence. *See* Blanchard Ex. 19; Hr'g at Min. 11:26–:40. In fact, after signing the MOU, Jones took affirmative steps to perform under the MOU: he continuously asked for updates about the business, including the status of

---

[4] Jones concedes that he executed the MOU and e-mailed it to Christine Blanchard, but contends that he did not witness Andrew Blanchard sign the agreement. *See* Hr'g at Min. 10:37. But the Blanchards' testimony and documentary evidence indicate otherwise. *See* Blanchard Ex. 17; Hr'g at Min. 10:50–:55; 11:21–:25.

[5] Pearl, Inc. owed $575,000 to mortgagee M&T Bank, $617,848 to mortgagee Small Business Administration, $250,000 to mortgagee Terrebonne Parish Consolidated Government, and $321,792 to mortgagee World Business Leaders, LLC. *See* Blanchard Exs. 1, 2 & 27.

debts and upcoming foreclosure sales; he paid outstanding penalties and interest on Pearl, Inc.'s debts; and he negotiated on behalf of Pearl, Inc. with its creditors to stave off foreclosure for approximately fifteen months. *See* Blanchard Exs. 57, 58, 65–67, 75 & 78; Hr'g at Min. 9:26–:30; 11:27–:59; 12:03. Jones also made utility, payroll, and insurance payments on behalf of the company. *See* Hr'g at Min. 11:32–:53; Blanchard Exs. 23–27, 29, 34–35, 41, 42, 47, 50–51, 54, 57, 59–60, 69–71, 73 & 78.

But Jones never paid off the balances of any of the debts in full and did not pay the Blanchards' salaries as promised. *See* Hr'g at Min. 9:26–:38; 10:01; 10:05; 10:11; 11:29; 11:50–:59; 12:03. Christine Blanchard continuously contacted Jones to remind him that payroll and other bills were due. *See* Blanchard Exs. 25, 42, 45 & 56; Hr'g at Min. 11:32–:53. Within months of signing the MOU, he instructed Christine Blanchard to lay off employees, effectively shutting down operations, and he let permits lapse. *See* Blanchard Ex. 42; Hr'g at Min. 11:35–:53. The permits Jones allowed to lapse were necessary to operate the business and, if not timely paid, those permits would be lost without any recourse; however, the Blanchards retained the permits for a time by making the payments themselves. *See* Hr'g at Min. 11:19; 11:35–:53. Jones also allowed creditors to foreclose upon the company's most productive plant. *See* Hr'g at Min. 10:09–:10; 11:38–:41. On September 17, 2019, Jones offered to quitclaim Pearl, Inc. back to the Blanchards after informing them that he would not pay off Pearl, Inc.'s debt. *See* Blanchard Exs. 79–80; Hr'g at Min. 11:43–:45; 12:01. But the Blanchards did not accept the offer. *See* Blanchard Ex. 79, Hr'g at Min 12:04. Indeed, by that time, the business was defunct and worthless. *See* Hr'g at Min. 10:09; 10:17–:20; 11:19–:20; 12:01–:06.

Because some of the company's debts were personally guaranteed by the Blanchards, they were eventually forced to file for chapter 11 bankruptcy relief personally as a result of the

7

foregoing events. *See* Hr'g at Min. 11:38; 12:00. Jones was aware of the Blanchards' dire financial situation; after he failed to perform under the MOU, he sent them an e-mail with a list of personal bankruptcy attorneys. *See* Hr'g at Min.12:00; Blanchard Ex. 77.

## CONCLUSIONS OF LAW

A. **Louisiana Law Governs the Contract**

When resolving state law claims that do not implicate federal policy, bankruptcy courts apply the choice-of-law rules of the forum in which they sit. *See ASARCO LLC v. Ams. Mining Corp.*, 382 B.R. 49, 60–61 (S.D. Tex. 2007) (citations omitted). Therefore, this Court applies Louisiana's choice-of-law rules found in the Louisiana Civil Code.

Article 3537 of the Louisiana Civil Code provides the general choice-of-law rule in the absence of a contractual choice-of-law clause: "Except as otherwise provided in this Title, an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue." LA. CIV. CODE. art. 3537. The Court concludes that, because the MOU lacks a choice-of-law provision, Louisiana law would be applicable here under article 3537. Pursuant to article 3537, applicable state law

> is determined by evaluating the strength and pertinence of the relevant policies of the involved states in light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

LA. CIV. CODE. art. 3537.[6]

---

[6] Article 3515 provides that applicable state law:

The relevant facts in this case point toward the application of Louisiana law. The Blanchards are domiciled in Louisiana. Pearl, Inc. is a Louisiana corporation, the company's assets are located in Louisiana, and Jones traveled to Louisiana to complete due diligence and witness Andrew Blanchard sign the MOU. *See* Hr'g at Min. 9:19–:24; 11:44. Under articles 3515 and 3537, Louisiana's policies would be most seriously impaired if its law were not followed.

### B. A Valid Contract Exists Between the Parties

#### 1. *The parties mutually consented to contract for the sale of Pearl, Inc.*

"A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished." *Okuarume v. S. Univ. of New Orleans*, 245 So. 3d 1260, 1264 (La. App. 4 Cir. 2018) (citing LA. CIV. CODE art. 1906). "Four elements are required for confection of a valid contract: (1) the capacity to contract; (2) mutual consent; (3) a certain object; and (4) lawful cause." *Id.* (citations omitted).[7] "[A] contract is formed by the consent of the parties established through offer and acceptance." *Id.* "Unless otherwise prescribed, offer and acceptance may be made orally, in writing or by action or inaction that under the circumstances is clearly indicative of consent." *Id.* (citing LA. CIV. CODE art. 1927); *see also Mathews v. Mathews*, 1 So. 3d 738, 745 (La. App. 2 Cir. 2008) ("For a valid contract, the court must find that there was a meeting of the minds of the parties to constitute consent.").

Here, all of the elements required for confection of a valid contract are present, including mutual consent. The parties agreed to exchange all of Pearl, Inc.'s assets and operations for Jones's

---

is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

LA. CIV. CODE. art. 3515.

[7] The capacity to contract and lawful cause to contract are not challenged here.

promise to pay $1,746,640 in debt and $50,000 annual salary to each of the Blanchards. *See* Blanchard Ex. 19. The Blanchards performed under the contract, quitclaiming Pearl, Inc.'s assets to Jones. *See* Blanchard Exs. 20 & 22. Jones did not fully perform under the contract, to the Blanchards' detriment. *See* Hr'g at Min. 9:26; 9:58; 10:01–:11; 11:21–:29; 11:50–:59; 12:03; Blanchard Ex. 79; *cf. Pace v. Rizzuto*, 182 So. 2d 809, 814 (La. Ct. App. 1966).

### 2. The MOU is a binding contract

Under Louisiana law, "[t]he words of a contract must be given their generally prevailing meaning." LA. CIV. CODE art. 2047. "Agreements legally entered into have the effect of laws on those who have formed them." *McCrary v. Park S. Props.*, 560 So. 2d 38, 45 (La. App. 2 Cir. 1990). "It is not the province of the court to relieve the party of a bad bargain, no matter how harsh." *Id*. Rather, "courts are bound to give legal effect to all contracts according to the true intent of the parties and the intent is to be determined by the words of the contract when these are clear and explicit and lead to no absurd consequences." *Id*. Indeed, "[a] court's overriding question when interpreting a contract is determining the parties' intent to give effect to their intentions." *Northstar Offshore Grp., LLC v. A&B Valve & Piping Sys., LLC (In re Northstar Offshore Grp., LLC)*, No. 17-03406, 2018 WL 5880949, at *5 (Bankr. S.D. Tex. Nov. 5, 2018) (citing *Reliant Energy Servs., Inc. v. Enron Can. Corp.*, 349 F.3d 816, 822 (5th Cir. 2003)).

"To determine intent, [courts] look to the plain language of the contract, its commercial context, and its purposes." *Reliant Energy Servs., Inc.*, 349 F.3d at 822 (citing *Pennzoil Co. v. FERC*, 645 F.2d 360, 388 (5th Cir. 1981)). Contract interpretation begins by looking to the "four corners" of the contract, followed by consideration of extrinsic evidence only if the contract is ambiguous. *Dean v. City of Shreveport*, 438 F.3d 448, 460 (5th Cir. 2006); *see also Reliant Energy Servs., Inc.,* 349 F.3d at 822 ("When a contract is expressed in unambiguous language, its terms

will be given their plain meaning and will be enforced as written." (citation omitted)). Indeed, "[w]hen the words of a contract are clear and unambiguous and lead to no absurd consequences, the Court will discern the contract's meaning and the parties['] intent within the four corners of the document." *Pellerin Constr., Inc. v. Witco Corp.*, 169 F. Supp. 2d 568, 578 (E.D. La. 2001) (citing LA. CIV. CODE arts. 1848 & 2046). Further, "[a] contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party." LA. CIV. CODE art. 2056.

Under Louisiana law, an MOU can be a binding contract as long as both parties sign the agreement and the language specifically confers duties on the parties. *See Listach v. W. Baton Rouge Par. Sch. Bd.*, No. 2021-0079, 2021 WL 2345691, at *5 (La. App. 1 Cir. 2021); *Kushi Healthcare, L.L.C. v. St. James Behavioral Health Hosp., Inc.*, 174 So. 3d 1192, 1196 (La. App. 1 Cir. 2015). Here, the record shows that the language of the MOU clearly indicates that Jones would pay Pearl, Inc.'s debt and $50,000 annually in salary to each of the Blanchards in exchange for the Blanchards quitclaiming Pearl, Inc.'s assets to Jones. *See* Blanchard Ex. 19. The record also shows that the parties intended the MOU to be a binding agreement. Although Jones never paid off any of the debts in full, he performed under the MOU as if it were a binding agreement, paying outstanding penalties and interest to stave off foreclosure, paying months of Pearl, Inc.'s utility and payroll obligations, and negotiating on behalf of Pearl, Inc. with its creditors. *See* Blanchard Exs. 42, 56–60, 65–67, 75 & 78; Hr'g at Min. 9:26; 11:29; 11:43; 11:50–:59; 12:03. The Blanchards likewise performed under the MOU as if it were a binding agreement by promptly quitclaiming the assets and continuing day-to-day operations at the company. *See* Hr'g at Min. 9:58; 10:02; 11:21–:25; Blanchard Exs. 20 & 22.

*3. The MOU was not subject to suspensive conditions*

"[A]n obligation subject to a suspensive condition depends upon the occurrence of an uncertain event." *Vector Elec. & Controls, Inc. v. JE Merit Constructors, Inc.*, No. 2005-2244, 2006 WL 3208462, at *3 (La. App. 1 Cir. 2006) (citing LA. CIV. CODE art. 1767).[8] "If the obligation depends upon a suspensive condition, the right to enforce it does not accrue until the occurrence or performance of the condition." LA. CODE CIV. P. art. 423.

Although Jones argued at trial that the MOU was subject to suspensive conditions such as the parties signing a formal purchase agreement and Jones obtaining financing, the MOU itself contains none of those alleged suspensive conditions and the record indicates that those conditions were neither communicated to nor agreed upon by the Blanchards. *See* Blanchard Ex. 19; Hr'g at Min. 9:22; 10:20; 11:26–:40. Thus, the Court affords no weight to Jones' testimony regarding the existence of suspensive conditions and finds that the MOU was not subject to any suspensive conditions.

**C.  Jones Breached the MOU and Is Liable for Damages**

*1. Jones breached the MOU*

"The essential elements of a breach-of-contract claim are the existence of a contract, the party's breach thereof, and resulting damages." *1100 S. Jefferson Davis Parkway, LLC v. Williams*, 165 So. 3d 1211, 1216 (La. App. 4 Cir. 2015) (citation omitted); *see also Bellwether Enter. Real Estate Capital v. Jaye*, Nos. 19-10351 & 19-13058, 2020 WL 3076661, at *9 (E.D. La. June 10, 2020). The doctrine of anticipatory breach-of-contract "applies when an obligor announces he will not perform an obligation which is due sometime in the future." *Latter & Blum,*

---

[8]  The Louisiana Supreme Court recognized in *Southern States Masonry, Inc. v. J.A. Jones Construction. Co.*, 507 So. 2d 198, 204 n. 15 (La.1987), that the common law term "condition precedent" is analogous to the civilian term "suspensive condition."

*Inc. v. Ditta*, 223 So. 3d 54, 59–60 (La. App. 4 Cir. 2017) (citations omitted). "The party claiming the rights under the contract bears the burden of proof." *1100 S. Jefferson Davis Parkway, LLC*, 165 So. 2d at 1216 (citation omitted).

Jones breached the MOU by not paying off the debts in full and by failing to pay the Blanchards' annual salaries after the Blanchards performed under the MOU by quitclaiming Pearl, Inc.'s assets and continuing day-to-day operations. *See* Blanchard Exs. 19–22 & 79; Hr'g at Min. 9:26–:38; 9:58; 10:01–:11; 11:21–:29; 11:50–:59; 12:03; Blanchard Ex. 79. Christine Blanchard inferred that Jones would not perform his obligations under the MOU in June 2019, when he told her he would not pay off the company's debt to stop the foreclosure on their personal home and e-mailed her a list of personal bankruptcy attorneys. *See* Blanchard Exs. 77; Hr'g at Min. 12:00–:01. But the Court finds that Jones anticipatorily breached the MOU in September 2019 when he affirmatively attempted to quitclaim Pearl, Inc.'s assets back to the Blanchards, thereby confirming that he had no intention of performing his obligations under the MOU. *See* Blanchard Exs. 79–80; Hr'g at Min. 12:04.[9]

---

[9] Under Louisiana law, fraud is defined as "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other." LA. CIV. CODE art. 1953. There are two elements necessary to prove legal fraud: an intent to defraud and a resulting damage. *Lomont v. Bennett*, 172 So. 3d 620, 629 (La. 2015). The party alleging fraud must prove these elements by a preponderance of the evidence. *Sun Drilling Prod. Corp. v. Rayborn*, 798 So. 2d 1141, 1153 (La. App. 4 Cir. 2001). "Circumstantial evidence, including highly suspicious facts and circumstances surrounding a transaction, may be considered in determining whether fraud has been committed." *Id.* "[F]raud cannot be based on mistake or negligence, regardless how great." *Lomont*, 172 So. 3d at 634 (citations omitted). When determining fraud, courts focus on the defendant's conduct and consider whether his misrepresentations "were deliberate and 'knowing' and whether evidence of the misrepresentations was concealed." *Id.* (citations omitted).

The Court finds, however, that the Blanchards failed to prove by a preponderance of the evidence that Jones intentionally misrepresented material facts or that he never intended to perform under the MOU. Therefore, the Court does not find that Jones committed a fraud against the Blanchards.

*2. Damages and legal interest*

The Blanchards request damages for unpaid salary, unpaid debt, pre-judgment interest, lost profits, and other financial losses stemming from the loss of Pearl, Inc.'s largest processing plant to foreclosure, the seizure of their home, the loss of equity in their assets, the filing of bankruptcy, and the loss of business opportunities. "An obligor is liable for the damages caused by his failure to perform a conventional obligation." LA. CIV. CODE art. 1994. "Damages are measured by the loss sustained by the obligee and the profit of which he has been deprived," LA. CIV. CODE art. 1995, but "[t]he party bringing suit has the burden of proving any damage suffered by it as a result of a breach-of-contract," *Payphone Connection Plus, Inc. v. Wagners Chef, LLC*, 276 So. 3d 589, 597 (La. App. 4 Cir. 2019) (internal quotations and citation omitted). "[W]hile damages for loss of profits may not be based on speculation and conjecture, such damages need be proven only within a reasonable certainty." *Ross & Wallace Paper Prod., Inc. v. Team Logistics, Inc.*, 308 So. 3d 346, 355–56 (La. App. 1 Cir. 2020).

Finding that Jones is liable to the Blanchards for breach of the MOU, the Court further finds that the Blanchards satisfied their burden to show that Jones is liable for damages caused by that breach. Specifically, Jones is liable to the Blanchards for one year and five months of salary (May 2018 to September 2019), or $120,833.33, as well as the total company debt Jones promised to pay, $1,746,640.[10] Therefore, the total amount of damages assessed against Jones is $1,867,473.33.

---

[10] The damages will not be offset by the interest payments Jones made to Pearl, Inc.'s creditors because the record does not include an accounting of those payments and the payments were not made toward the principal Jones promised to pay under the MOU. *See generally* Hr'g at Min. 8:55–12:26; Blanchard Exs. 1–80.

The Blanchards did not meet their burden, however, to show proof of additional damages. The Blanchards did not demonstrate with reasonable certainty additional damages associated from the repossession of the company's largest shrimp-processing plant, loss of business opportunities, lost profits, the filing of the bankruptcy, or the repossession of their personal home.

"A judgment may and should include an award of legal interest on the principal amount of the judgment where legal interest is provided by code article or statute." *Mini Togs Prod., Inc. v. Wallace*, 513 So. 2d 867, 872 (La. Ct. App.). Legal interest on breach-of-contract damages is "measured by the interest on that sum from the time it is due, at the rate agreed by the parties or, in the absence of agreement, at the rate of legal interest as fixed by R.S. 9:3500." LA. CIV. CODE art. 2000. "Legal interest on a contract . . . is due from the date of breach." *See Gardner Realtors, LLC v. Iteld*, 214 So. 3d 146, 155 (La. App. 4 Cir. 2017) (citing *Thomas B. Catchings & Assoc. v. City of Baton Rouge*, 621 So. 2d 768, 769 (La. 1993)). The current legal interest rate is 3.5% per year. *See* LA. REV. STAT. § 13:4202(B)(1).[11]

The MOU does not provide a legal interest rate, so the Court will impose the current Louisiana legal interest rate. *See* Blanchard Ex. 19; LA. REV. STAT. § 13:4202(B)(1). Legal interest on $1,867,473.33 will be calculated from September 17, 2019, the date Jones anticipatorily breached the agreement, to the date of the Judgment entered in this matter.

## CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that the Complaint is **GRANTED IN PART** and **DENIED IN PART** with each party to bear their own costs.

---

[11] Louisiana's judicial interest rate is published annually. *See Judicial Interest Rate*, LA. ST. B. ASS'N, https://www.lsba.org/members/judicialinterestrate.aspx.

**IT IS FURTHER ORDERED** that Andrew and Christine Blanchard are entitled to judgment against Gregory Jones on their breach-of-contract claim in the amount of $1,867,473.33, plus legal interest from September 17, 2019, to the date of Judgment entered contemporaneously in this matter.

**IT IS FURTHER ORDERED** that all claims against Gulf Coast Premium Seafoods, LLC are dismissed.

A separate judgment on the Complaint filed in the consolidated, above-captioned Adversary Proceeding consistent with this Memorandum Opinion and Order will be entered in accordance with Bankruptcy Rule 7054.

New Orleans, Louisiana, November 19, 2021.

_____
MEREDITH S. GRABILL
UNITED STATES BANKRUPTCY JUDGE